**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Curtis A Dickman,

          Plaintiff,

v.

New York Life Insurance Company, et al.,

          Defendants.

No. CV-25-00138-PHX-DWL

**ORDER**

    In 1992, Plaintiff Curtis A. Dickman, M.D. ("Plaintiff") applied for a disability income policy (the "Policy") issued by Defendants New York Life Insurance Company and New York Life Insurance and Annuity Corporation (collectively, "New York Life"). Plaintiff selected a benefit term payable up to "age 65."

    Plaintiff subsequently suffered orthopedic and neurological injuries that prevented him from working as a neurosurgeon. As a result, Plaintiff successfully applied to The Paul Revere Life Insurance Company ("Paul Revere") and Unum Life Insurance Company of America ("Unum"), as administrators on behalf of New York Life, for disability income benefits. However, Paul Revere and Unum later informed Plaintiff that the payments would stop on June 1, 2024, the Policy's anniversary date, as opposed to August 4, 2024, Plaintiff's 65th birthday.

    In this putative class action, Plaintiff asserts various contract and tort claims against New York Life, Unum, and Paul Revere (collectively, "Defendants"). (Doc. 1.) Now pending before the Court is Defendants' motion to dismiss for failure to state a claim. (Doc.

10.)  For the reasons that follow, the motion is granted in part and denied in part and Plaintiff is granted leave to amend.

BACKGROUND

I.    <u>Factual Allegations</u>

The following facts, presumed true, are derived from the complaint.  (Doc. 1.)

A.    **The Parties**

Plaintiff is an Arizona citizen and a "neurosurgeon who exclusively practiced neurosurgery in a private practice."  (*Id.* ¶¶ 5, 27.)

Defendant New York Life Insurance Company is "incorporated under the laws of New York with its principal place of business in New York" and "marketed, advertised, wrote, and/or administered disability insurance to or for consumers, either directly or through its wholly-owned and controlled subsidiaries."  (*Id.* ¶ 6.)

Defendant New York Life Insurance and Annuity Corporation is "incorporated under the laws of Delaware with its principal place of business in New York" and "is a direct, wholly-owned subsidiary of New York Life Insurance Company."  (*Id.* ¶ 7.)  It also "marketed, advertised, wrote, and/or administered disability insurance to or for consumers."  (*Id.*)

Defendant Unum is "incorporated under the laws of Maine with its principal place of business in Chattanooga, Tennessee" and "marketed, advertised, and/or administered disability insurance to or for consumers."  (*Id.* ¶ 9.)

Defendant Paul Revere is "incorporated under the laws of Massachusetts with its principal place of business in Worcester, Massachusetts" and "is a wholly-owned subsidiary of Defendant Unum."  (*Id.* ¶ 8.)  It also "marketed, advertised, and/or administered disability insurance to or for consumers."  (*Id.*)

B.    **The Challenged Conduct**

In 1992, Plaintiff searched for disability insurance.  (*Id.* ¶ 28.)  Plaintiff "communicated with an agent for New York Life, who reinforced the New York Life promotional materials' message of monthly disability benefits through a certain age."  (*Id.*

¶ 29.)

In or around May 1992, "Plaintiff applied for a premier disability income policy with New York Life." (*Id.* ¶ 31.) "The application, which was a standardized form prepared by New York Life, specified the policy would be through a certain term, either for two years, for five years, to age 65, to age 67, or for a lifetime. Plaintiff selected a benefit term of to age 65." (*Id.*) "Neither the New York Life promotional materials, the New York Life application, nor the agent acting on behalf of New York Life suggested the disability benefits would terminate by the policy anniversary date closest to an insured's 65th birthday." (*Id.* ¶ 32.)

Plaintiff then "received a premier disability income policy from New York Life with a policy date of June 1, 1992, Policy Number H3215198." (*Id.* ¶ 33.) The Policy cover letter "stated the benefits were renewable to age 65, and conditionally renewable after 65." (*Id.* ¶ 34.) The letter "also explicitly stated that Plaintiff's insurance application, in which it was indicated that he would receive benefits to age 65, was part of the policy." (*Id.*)

The Policy's "data page also indicated the disability income benefits would be payable up to age 65." (*Id.* ¶ 35.) In addition, the Policy "had multiple riders," and "[o]ne rider, the cost of living benefit, provided a living adjustment table based on Plaintiff's age through 65" while "[a]nother rider, as to residual disability, provided that monthly income benefits for a residual disability would be paid monthly until Plaintiff reached age 65." (*Id.* ¶¶ 36, 37.)

Plaintiff "paid all of his monthly premiums on the Policy and renewed the Policy annually." (*Id.* ¶ 38.) Subsequently, "Plaintiff suffered serious orthopedic and neurological injuries, which as of October 2014 prevented him from working as a neurosurgeon. Unum and Paul Revere, as administrator on behalf of New York Life, accepted Plaintiff's disability claim and began paying disability income benefits under the Policy." (*Id.* ¶ 39.)

Plaintiff "was set to turn age 65 on August 4, 2024." (*Id.* ¶ 40.) "In February 2024, Unum and Paul Revere wrote Plaintiff to inform him that Defendants would be stopping

payment of disability income benefits to Plaintiff under the Policy as of June 1, 2024, the Policy's anniversary date"—which was "two months prior to when Plaintiff was going to reach the age of 65." (*Id.* ¶¶ 41, 42.) "When the policy anniversary date of June 1, 2024 arrived, Defendants stopped making disability income benefit payments to Plaintiff." (*Id.* ¶ 43.)

Plaintiff alleges that he "should have received benefits under the Policy at least through his 65th birthday in August 2024, if not to June 1, 2025, the anniversary date of the policy which incorporates his 65th birthday." (*Id.* ¶ 44.) "As a result of Defendants' wrongful conduct, Plaintiff has been denied benefits at least totaling approximately $4,229.22 dollars for the time period between June 1, 2024 and August 4, 2024, if not through his next policy anniversary of June 1, 2025 totaling approximately $24,556.70, which is the first policy anniversary during which he actually would be age 65." (*Id.* ¶ 46.)

C.    **The Policy**[1]

The relevant provisions of the Policy are as follows. The two paragraphs on the first page of the Policy provide that "**New York Life Insurance Company** will pay the benefits of this policy in accordance with its provisions" and "**10 day free examination period**. Please examine this policy. Within 10 days after delivery, the policy can be returned to the Company or to the agent through whom it was purchased, with a written request for a full refund of premium." (Doc. 1-1 at 3.)

The second page of the Policy is entitled "BENEFITS." (*Id.* at 4.) The "PRIMARY PLAN" is described as including the following "BENEFIT TERM": "BENEFITS ARE PAYABLE UP TO AGE 65, OR IF THE DISABILITY BEGINS AT AGE 60, IT WILL PAY UP TO AGE 65 OR 2 YEARS, WHICHEVER IS LONGER." (*Id.*)

The third page of the Policy is a table of contents. (*Id.* at 5.) It identifies the

---

[1]    The Policy is attached as Exhibit A to the complaint. (Doc. 1-1.) Ordinarily, if a district court considers evidence outside the pleadings when ruling on a motion to dismiss, it must convert the motion into a motion for summary judgment and give the nonmovant an opportunity to respond. *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). A district court may, however, consider "documents attached to the complaint" in ruling on a motion to dismiss. *Id.* at 908.

following nine sections: (1) Policy data; (2) Definitions; (3) Benefits; (4) Claims; (5) Premiums; (6) Right to Renew Policy; (7) General Provisions; (8) Application; and (9) Rides or Endorsements (If Any). (*Id.*) As for the second section ("Definitions"), the table of contents also lists the 10 terms that are specifically defined in that section. (*Id.*) The first term is "Age." (*Id.*)

The fourth page of the Policy is the "Definitions" section. (*Id.* at 6.) As noted, the first defined term is "Age," which is defined as follows:

> **Age** Reference to an age in this policy, such as "age 65", means the policy anniversary nearest to the birthday of the Insured on which he or she is that age. For example, "Guaranteed Renewable to Age 65" means that the policy can be renewed until the policy anniversary which is closest to the Insured's 65th birthday.

(*Id.*)

A later page of the Policy is the "General Provisions" section. (*Id.* at 14.) Here, the term "Entire Contract" is defined as follows:

> **Entire Contract** The entire contract consists of this policy, any attached riders or endorsements, and the attached copy of the application. Only the Chairman, the President, the Secretary, or one of our Vice Presidents can change the contract, and then only in writing. No change will be made in the contract unless you agree to it in writing. No agent is authorized to change this contract.

(*Id.*)

Attached to the Policy is a copy of Plaintiff's application, which reflects that Plaintiff selected a "PRIMARY PLAN" benefit term of "To Age 65." (*Id.* at 28.)

II.    <u>Procedural History</u>

On January 16, 2025, Plaintiff filed the complaint. (Doc. 1.) Count One is a claim for breach of contract. Count Two is a claim for breach of the implied covenant of good faith and fair dealing. Count Three is a claim for declaratory relief. Count Four is a claim for reformation. Count Five is a claim for fraudulent inducement. Count Six is a claim for negligent misrepresentation. Count Seven[2] is a claim for "violation of consumer protection

---

[2]    The complaint uses the label "Count VI" to describe both the negligent

1    laws."  Count Eight is a claim for "bad faith."

2         On March 28, 2025, Defendants filed the pending motion to dismiss the complaint.

3    (Doc. 10.)  The motion later became fully briefed.  (Docs. 15, 16.)

4         On October 20, 2025, the Court issued a tentative ruling.  (Doc. 20.)

5         On October 28, 2025, the Court heard oral argument.  (Doc. 21.)

6                                    **DISCUSSION**

7    I.   <u>Legal Standard</u>

8         A.    **Rule 12(b)(6)**

9         Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient

10   factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *In re*

11   *Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks

12   omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that

13   allows the court to draw the reasonable inference that the defendant is liable for the

14   misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll

15   well-pleaded allegations of material fact in the complaint are accepted as true and are

16   construed in the light most favorable to the non-moving party."  *Id.* at 1144-45 (citation

17   omitted).  However, the court need not accept legal conclusions couched as factual

18   allegations.  *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of

19   a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.

20   The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v.*

21   *Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

22        B.    **Rule 9(b)**

23        Defendants assert, and Plaintiff does not dispute, that Plaintiff's claims for

24   fraudulent inducement, negligent misrepresentation, and under the Arizona Consumer

25   Fraud Act ("ACFA") are subject to the heightened pleading requirements of Federal Rule

26   of Civil Procedure 9(b).[3]  *See, e.g.*, *AZG Enter. Inc. v. Honeywell Int'l Inc.*, 2025 WL

27
     misrepresentation claim and the "violation of consumer protection laws" claim, but in
28   context it is clear that the latter was intended to be Count Seven.

     [3]      During oral argument, Defendants asserted for the first time that two of Plaintiff's

2480943, *3 (D. Ariz. 2025) ("Plaintiff's claim for fraud and/or fraudulent inducement may survive, although it is subject to a Rule 9(b) analysis."); *Estrada v. Capella Univ., Inc.*, 2018 WL 1428155, *2 (D. Ariz. 2018) ("Claims for negligent misrepresentation must meet the particularity requirements of Rule 9(b).") (cleaned up); *In re Banner Health Data Breach Litig.*, 2017 WL 6763548, *6 (D. Ariz. 2017) ("Claims arising under the ACFA pertain to fraud and are thus subject to the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.").  *See also Sweeney v. Darricarrere*, 2009 WL 2132696, *12 n.109 (D. Ariz. 2009) ("Although the Ninth Circuit has suggested that negligent misrepresentation may be a non-fraudulent averment, most district courts within the Ninth Circuit have held that a [negligent misrepresentation claim is subject to the] heightened pleading requirements of Rule 9(b).") (cleaned up).

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." *Id.*  "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (cleaned up).  *See also Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (under Rule 9(b), the plaintiff "must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation").  "[T]he circumstances constituting the alleged fraud [must] be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citations and internal quotation marks omitted).  However, "[a] plaintiff in a fraud-by-omission suit faces a slightly more

---

other claims (the breach-of-contract claim in Count One, at least in part, and the reformation claim in Count Four) are also subject to Rule 9(b).  These arguments are forfeited.  *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 n.4 (9th Cir. 2016) ("[W]e treat this argument as waived because [it] was raised for the first time at oral argument."); *Lopez v. Bank of Am., N.A.*, 505 F. Supp. 3d 961, 972 n.2 (N.D. Cal. 2020) ("The Court ordinarily declines to consider arguments made for the first time at a motion hearing.").

1   relaxed burden, due to the fraud-by-omission plaintiff's inherent inability to specify the

2   time, place, and specific content of an omission in quite as precise a manner." *In re Banner*

3   *Health Data Breach Litig.*, 2017 WL 6763548 at *7 (citations omitted).

4   II.    Breach of Contract (Count One)

5        A.    **The Parties' Arguments**

6        The complaint alleges that Defendants breached the Policy because Plaintiff's

7   "agreement with Defendants provided for disability income benefit payments to be paid by

8   Defendants through the date on which [he] turned . . . age 65." (Doc. 1 ¶ 61.)

9        Defendants argue that the "plain language of Plaintiff's Policy conclusively

10  disproves [the Breach of Contract] allegations and, rather, establishes that Defendants have

11  fully complied with the Policy's express terms." (Doc. 10 at 5.) Defendants contend that

12  "all references to 'age 65' in the Policy, including those in the application, are subject to

13  the Policy's clear and unambiguous definition of 'Age.'" (*Id.*, record citations omitted.)

14  Defendants further argue that "[b]ecause it is undisputed that Defendants paid Plaintiff

15  benefits through 'the policy anniversary nearest to' Plaintiff's sixty-fifth birthday,

16  Defendants did not breach the Policy, but instead fully complied with its terms, and

17  Plaintiff's breach of contract claim fails as a matter of law." (*Id.* at 5-6.)

18       In response, Plaintiff argues that he "adequately alleges a breach of contract claim

19  because the Policy is ambiguous, thereby precluding a ruling on the pleadings alone."

20  (Doc. 15 at 10.) Plaintiff contends the Policy "when properly read as a whole, at best is

21  internally contradictory and therefore ambiguous." (*Id.*) In support, Plaintiff cites *Sparks*

22  *v. Republic Nat'l Life Ins. Co*., 647 P.2d 1127 (Ariz. 1982). (*Id.*) In the alternative, Plaintiff

23  argues that "the doctrine of reasonable expectations further precludes disposition of Count

24  I as a matter of law at this early pre-discovery stage." (*Id.*) Plaintiff contends that

25  "Defendants repeatedly promised disability benefits to Plaintiff's 65th birthday" and that

26  "based on those promises and related materials he reasonably believed the coverage he

27  applied for, received, and paid for was through his 65th birthday." (*Id.* at 13.)

28       In reply, Defendants argue that "the term 'age 65' in the Policy, including references

in the application, cover letter, data page, and riders, is modified by the Policy's undisputedly unambiguous definition of 'Age'" and "appears exactly where one would expect to find such a definition." (Doc. 16 at 2, 4.) Defendants further argue, in response to the reasonable expectations argument, that the Policy's definition of age is "clear and concise" and that "the reasonable expectations doctrine has no application here." (*Id.* at 5.)

B.    **Analysis**

1.    Ambiguity

Under Arizona law,[4] "[t]he interpretation of an insurance contract is a question of law." *Sparks*, 647 P.2d at 1132. An insurance policy is "read as a whole, so as to give a reasonable and harmonious effect to all of its provisions." *Charbonneau v. Blue Cross of Wash. & Alaska*, 634 P.2d 972, 975 (Ariz. Ct. App. 1981). "Absent a specific definition, terms in an insurance policy are construed according to their plain and ordinary meaning, and the policy's language should be examined from the viewpoint of one not trained in the law or in the insurance business." *Equity Income Partners, LP v. Chicago Title Ins. Co.*, 387 P.3d 1263, 1267 (Ariz. 2017) (cleaned up). "Where the language employed is unclear and can be reasonably construed in more than one sense, an ambiguity is said to exist and such ambiguity will be construed against the insurer." *Sparks*, 647 P.2d at 1132. "If an insurer desires to limit its liability under a policy, it should employ language which clearly and distinctly communicates to the insured the nature of the limitation." *Id.* at 1133.

The dispute turns on whether the term "Age" in the Policy is ambiguous, as Plaintiff

---

[4]    Defendants rely on Arizona law in support of their motion to dismiss. (Doc. 10.) Plaintiff, in turn, asserts that "Defendants assume without analysis that Arizona law governs Count I, not the laws of Defendants' home states of New York or Massachusetts." (Doc. 15 at 10 n.3.) However, Plaintiff does not argue that Arizona law is inapplicable and also cites Arizona authorities in support of his arguments regarding his contract claims. Plaintiff also clarifies, with respect to his tort claims, that "as an Arizona resident, [he] is only asserting his own claims under Arizona law." (*Id.* at 8 n.1.) Under these circumstances, the Court will assume that Arizona law applies. *See generally Norcia v. Samsung Telecomms. Am, LLC*, 845 F.3d 1279, 1283-84 (9th Cir. 2017) ("Here, the parties agree that California law governs the issue of contract formation."); *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (discussing the principle of party presentation).

asserts,[5] or unambiguously refers to the policy anniversary nearest to the birthday of the insured, as Defendants assert.  "While insurance contracts are construed most favorably to the insured where the meaning of the language is doubtful, such rule is inapplicable when the language is not doubtful and is defined within the contract itself."  *Schwab v. State Farm Fire & Cas. Co.*, 558 P.2d 942, 946 (Ariz. Ct. App. 1976) (cleaned up).  The term "Age" is defined within the Policy itself as the "policy anniversary nearest to the birthday of the insured."  (Doc. 1-1 at 6.)  That language is neither unclear nor doubtful.  The term "Age" under the Policy means one thing—the policy anniversary nearest to the birthday of the insured.

Plaintiff nevertheless contends that an ambiguity must exist because the definition of "Age" adopted in the Policy differs from the "common and ordinary" meaning of that term.  (Doc. 15 at 11.)  But as discussed above, Arizona law holds that, "*[a]bsent a specific definition*," "terms in an insurance policy are construed according to their plain and ordinary meaning."  *Equity Income Partners,* 387 P.3d at 1267 (emphasis added).  Thus, the rule of ambiguity identified by Plaintiff applies in Arizona only when, unlike here, the term at issue is not "defined within the contract itself."  *Schwab*, 558 P.2d at 946.[6]

---

[5]     During oral argument, Plaintiff asserted that even if the term "Age" in the Policy is not ambiguous, the phrase "Benefit Term" is ambiguous.  This argument lacks merit.  The Policy defines "Benefit Term" as follows: "A period of time for which monthly income benefits are payable for disability due to the same cause.  It starts on the day after the Elimination Period ends.  It goes on until (1) the Insured is no longer disabled, or (2) the end of the Maximum Benefit Term shown on the Data page, or (3) the death of the insured, whichever occurs first."  (Doc. 1-1 at 6.)  The "Data page" defines "BENEFIT TERM" as follows: "BENEFITS ARE PAYABLE UP TO AGE 65, OR IF THE DISABILITY BEGINS AT AGE 60, IT WILL PAY UP TO AGE 65 OR 2 YEARS, WHICHEVER IS LONGER."  (*Id.* at 4.)  Because, as discussed in the body of this order, the term "Age" is not ambiguous in light of its clear, easily located definition, other phrases in the Policy are not rendered ambiguous simply because they direct an insured to portions of the Policy that refer to that defined, unambiguous term.

[6]     *See also Sylvester v. FCCI Inc. Co.*, 373 F. Supp. 3d 857, 866 (E.D. Mich. 2019) (explaining that under Michigan law, "[w]hether a vehicle is 'uninsured' as the term is colloquially used is irrelevant where the term is defined within the contract" and citing other cases applying Michigan law for the proposition that "[w]here a contract defines a term, the contractual definition of the defined term controls over the common usage of the term"); *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 219 (Tex. 2003) (rejecting the contention "that it is proper to disregard defined terms in a policy in favor of definitions not expressed in the parties' written agreements" and holding that "[w]hen terms are defined in an insurance policy, those definitions control the interpretation of the policy"); *Valliere v. Allstate Ins. Co.*, 596 A.2d 636, 638 (Md. Ct. App. 1991) ("When a policy

Nor does *Sparks* support Plaintiff's position.  There, the Arizona Supreme Court concluded that an insurance policy was "ambiguous" and "fail[ed] to communicate the nature of the limitations urged by defendants" because "the sections of the policy which an insured would normally look to in order to ascertain what the policy does not cover are silent on the limitations argued by defendants."  *Sparks*, 647 P.3d at 1133.  The court specifically highlighted that the policy's "Definitions and Exceptions" section made no mention of the limitation.  *Id*.  That flaw is not present here.  The Policy's definition of the term "Age" is set forth on the fifth page of the Policy, under the bolded heading "**DEFINITIONS**," and is the first definition included on the page.  (Doc. 1-1 at 6.)  The definition of the term "Age" falls exactly in the section of the Policy to which an insured would normally look.

### 2.    Reasonable Expectations

The absence of ambiguity does not end the analysis, because under the doctrine of reasonable expectations, "Arizona courts will not enforce even unambiguous boilerplate terms in standardized insurance contracts in a limited variety of situations."  *Gordinier v. Aetna Cas. & Sur. Co.*, 742 P.2d 277, 283 (Ariz. 1987).  *See generally* Jean Braucher, *Cowboy Contracts: The Arizona Supreme Court's Grand Tradition of Transactional Fairness*, 50 Ariz. L. Rev. 191, 214 (2008) (noting that "Arizona has embraced the 'reasonable expectations' doctrine concerning terms in non-negotiated standard form contracts as a basis for non-enforcement of surprising terms" and emphasizing "how expansive this doctrine is in Arizona").

The "essential element" of the inquiry under the reasonable expectations doctrine is

---

defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *Nat. Auto. & Casualty Ins. Co. v. Contreras*, 193 Cal. App. 3d 831, 837 (Cal. Ct. App. 1987) ("The policy of insurance must be intelligible to the persons to whom it is sold.  Where such persons are laymen, the level of intelligibility must be so gauged and in this sense the language used must be ordinary language.  That does not preclude the explicit definition of policy terms (even in unusual ways), provided that the language of the definition is intelligible and accessible (i.e., so located as to be easily found) to the layman (or audience) to which the policy is sold."); *Woods v. Nationwide Mut. Ins. Co.*, 246 S.E.2d 773, 777 (N.C. 1978) ("Where a policy defines a term, that definition is to be used.").

whether the insurer "had 'reason to believe' that the [insured] would not have agreed to [the term] if they had been aware of its presence in the policy." *State Farm Fire & Cas. Ins. Co. v. Grabowski*, 150 P.3d 275, 281 (Ariz. Ct. App. 2007). "The drafter's reason to believe that the signing party would not have assented to the term may be (1) shown by the parties' prior negotiations, (2) inferred from the circumstances of the transaction, (3) inferred from the fact that the term is bizarre or oppressive, (4) inferred from the fact that the term eviscerates the non-standard terms to which the parties explicitly agreed, or (5) inferred if the term eliminates the dominant purpose of the transaction." *Id.* at 280. *See also Castle v. Barrett-Jackson Auction Co., LLC*, 276 P.3d 540, 543 (Ariz. Ct. App. 2012) (same). Moreover, "an inference that the drafter knew the signing party would not have agreed to the term may be reinforced if the signing party never had an opportunity to read the term or if it is illegible or otherwise hidden from view." *Am. Fam. Mut. Ins. Co. v. Verdugo*, 2016 WL 9458582, *18 (D. Ariz. 2016) (citation and internal quotation marks omitted). The reasonable expectations doctrine, however, "must be limited by something more than the fervent hope usually engendered by loss." *Am. Fam. Mut. Ins. Co. v. White*, 65 P.3d 449, 455 (Ariz. Ct. App. 2003) (cleaned up).

In *Gordinier*, the Arizona Supreme Court identified four "factual scenarios . . . [that] illustrate some of the circumstances under which the reasonable expectations doctrine may be applied." *Grabowski,* 150 P.3d at 281 (emphasis omitted). Those scenarios are: "(1) Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured; (2) Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage; (3) Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured; and (4) Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously

denied by the policy." *Gordinier*, 742 P.2d at 283-84 (cleaned up).  Plaintiff does not argue that the first *Gordinier* scenario is implicated.  (Doc. 15 at 13.)  Instead, Plaintiff argues that "[s]ituations (2), (3), and (4) all apply here."  (*Id.*)  Plaintiff argues that "Defendants repeatedly promised disability benefits to Plaintiff's 65th birthday," "that based on those promises . . . he reasonably believed coverage . . . was through his 65th birthday," and that he "would not have purchased the policy, or would have paid less, had he known the truth."  (*Id.*)

Under the second *Gordinier* scenario, an insured must demonstrate, among other things, that he did not receive full and adequate notice of the term.  "An insurer gives adequate notice of a policy's clear and unambiguous terms if it gives a copy of the policy to the insured and takes reasonable steps to make sure any exclusions or limitations are made apparent to the insured."  *Certain Underwriters at Lloyds, London v. Payson Premier, LLC*, 2009 WL 1156705, *3 (Ariz. Ct. App. 2009).  *See also White*, 65 P.3d at 456 (adequate notice where the "exclusion is not lengthy, confusing, complex, or buried in the policy").  Plaintiff does not appear to dispute that Defendants sent him the Policy, nor does Plaintiff assert that he failed to review the Policy.  The Policy itself also indicates that Plaintiff had a "10 day free examination period," during which Defendants expressly encouraged Plaintiff to "[p]lease examine this policy."  (Doc. 1-1 at 3.)  Furthermore, as discussed above, this case differs from *Sparks* in that the term in question was clearly defined at the very beginning of the "Definitions" section of the Policy.  (*Id.* at 6.)  Given this backdrop, this case does not fall within the second *Gordinier* scenario.

To implicate the third and fourth *Gordinier* scenarios, Plaintiff must allege activity reasonably attributable to Defendants that (a) created an objective impression of coverage in the mind of a reasonable insured or (b) induced Plaintiff to reasonably believe he had coverage.  "An activity is reasonably attributed to the insurer when an insured's expectations are induced by the insurer's making of a promise.  An expectation reasonably attributable to the insurer does not exist[] where an agent of the insurer, or the insurer itself, fails to make a promise outside of the insurance policy."  *Team 44 Restaurants LLC v. Am.*

1    *Ins. Co.*, 2022 WL 458494, *5 (D. Ariz. 2022) (citations omitted).  The complaint alleges

2    that "[Plaintiff] was promised, applied for, and received a disability insurance policy that

3    promised disability benefits to age 65."  (Doc. 1 ¶ 3.)  The complaint further alleges that

4    "New York Life promises its disability insurance offerings will provide cost effective

5    coverage to age 65."  (*Id.* ¶ 19.)  The complaint also alleges that "[e]ach Defendant

6    promised disability income benefit payments through a certain specified date (e.g., age 65

7    or age 67), but the benefits provided are not as promised and not the same as those

8    represented and bargained for."  (*Id.* ¶ 116.)

9        Even though, as discussed in Part II.B.1 above, an *ambiguity* doesn't arise under

10   Arizona law when an insurer clearly adopts a particular definition of a term in the

11   definitions section of an insurance policy (even if the chosen definition deviates from the

12   common and ordinary meaning of the term), that approach may still create a *reasonable

13   expectations* problem.  *Gregorio v. GEICO General Ins. Co.*, 815 F. Supp. 2d 1097, 1105

14   (D. Ariz. 2011) ("Arizona's formulation of the reasonable expectations doctrine is

15   expansive.  The doctrine can be applied to unambiguous contracts.") (citations omitted).

16   Such is the case here.  Plaintiff plausibly alleges that a reasonable consumer would perceive

17   advertisements for an insurance policy providing benefits "to age 65" as a promise of

18   benefits that will extend until the insured's 65th birthday.  Indeed, the Court cannot fathom

19   how a reasonable consumer could view such an advertisement as offering anything

20   different.  It strains credulity that a reasonable consumer would view such an advertisement

21   and conclude that the promised benefits only extend until some date, which may fall

22   months before the insured's 65th birthday, that is somehow tied to the policy renewal date.

23   *Cf. Laurent v. PriceWaterhouseCoopers LLP*, 963 F. Supp. 2d 310, 320-21 (S.D.N.Y.

24   2013) ("As a matter of ordinary usage, the query 'what's your age?' should not be met with

25   the response, 'the first time I went to work, as modified by an algorithm that I'll now

26   describe' . . . .  Rather, the usual answer would take the form of a discrete chronological

27   age, such as '30.'").  Although Defendants[7] were free to adopt that unusual definition of

28   ───────────────
     [7]    During oral argument, Defendants asserted for the first time that because the
     complaint does not properly attribute the conduct underlying Count One to Unum and Paul

the term "Age" in the definitions section of the Policy, their decision to do so has no bearing on how a reasonable consumer would perceive advertisements (which did not contain any such definitional information) promising benefits "to age 65." *Cf. Averett v. Farmers Ins. Co. of Ariz.*, 869 P.3d 505, 508 (Ariz. 1994) (reversing trial court's grant of summary judgment in favor of the insurer, even though the insurance policy's household policy exclusion unambiguously barred the insured's claim, because "[w]e strongly suspect that most consumers . . . would be surprised" that the exclusion would apply); *Cawley v. Am. Fin. Sec. Life Ins. Co.*, 2025 WL 641182, *3-4 (D. Ariz. 2025) (denying insurer's motion for summary judgment, even though "Plaintiffs do not dispute that all benefits under the policy as written were paid out to them," because it was "a debatable question" whether "the average, reasonably informed policyholder would" believe the policy operated in that manner).

The fundamental inquiry, to be clear, is not whether any of the *Gordinier* scenarios are satisfied—instead, the "essential element" under the reasonable expectations doctrine is whether Defendants had "reason to believe" Plaintiff would not have agreed to their definition of the term "Age" had he been aware of it. *Grabowski*, 150 P.3d at 281. Although Plaintiff's showing on this point is not overwhelming, he has done enough at this early stage of the case to avoid dismissal. "[T]he insurer's reason to believe the insured would not have agreed can be *inferred* from the circumstances of the transaction or terms of the policy." *Cawley*, 2025 WL 641182 at *6. Among other things, "[r]eason to believe may be inferred from the fact that the term is bizarre." Restatement (Second) of Contracts § 211, cmt.f. *See also Grabowski*, 150 P.3d at 281-82 ("We recognize that if the jury found that the exclusion was bizarre or unexpected in nature, . . . it might have inferred that State Farm had 'reason to believe' that the Hedges would not have agreed to the exclusion."); *Angus Med. Co. v. Digital Equip. Corp.*, 840 P.2d 1024, 1031 (Ariz. Ct. App. 1992) ("[A] term may be shown to be 'unusual or unexpected' . . . by virtue of its rarity."). For

_____

Revere, those Defendants should be entitled to dismissal of Count One even if New York Life is not. This argument is forfeited due to Defendants' failure to raise it in their motion to dismiss.

essentially the same reasons that a reasonable consumer could have perceived Defendants' advertisements as promising benefits until the insured's 65th birthday, a reasonable factfinder could also conclude that Defendants' contrary definition of the term "Age" in the Policy was bizarre, unusual, and unexpected[8]—and, thus, that Defendants had reason to believe Plaintiff would not have agreed to the Policy had he been aware of that definition.

In reaching this conclusion, the Court acknowledges that Defendants' provision of a 10-day review-and-cancellation period tends to undermine the "reason to believe" inference. With that said, the Court is unaware of any authority (and Defendants could not identify any authority during oral argument) suggesting that the provision of such a review-and-cancellation period is dispositive. In a similar vein, although the definition of "Age" adopted in the Policy did not dramatically or oppressively alter the scope of coverage in the same manner as the challenged terms in other reasonable expectations cases—in Plaintiff's case, it only shaved off two months of coverage from a multi-year coverage period, and as Defendants note in their reply, "[f]or many insureds, 'the policy anniversary date nearest to' their sixty-fifth birthday will be after that birthday, so they will receive benefits beyond their sixty-fifth birthday" (Doc. 16 at 2 n.2, emphasis omitted)—the Court is unaware of any authority suggesting that this consideration is dispositive, particularly at the motion-to-dismiss stage where all reasonable inferences must be resolved in Plaintiff's favor. *Cf. Grabowski*, 150 P.3d at 280 (when evaluating whether the drafter had "reason to believe that the signing party would not have assented to the term," "circumstantial evidence is critical to such a determination"). An inquiry into whether an insurer had "reason to believe" an insured would not have agreed to a term is typically a question of fact and thus not typically suitable for resolution at this early stage. *See generally Morgan ex rel. Clark v. Am. Fam. Mut. Ins. Co.*, 563 F.3d 898, 902 (9th Cir. 2009) ("[*Grabowski*]

---

[8] Because the record on this point is undeveloped, the Court "draw[s] on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, in concluding that it is plausible that the Policy's definition of the term "Age" is bizarre, unusual, and unexpected. At a future stage of the case, on a different record, the analysis could be different. Indeed, during oral argument, Plaintiff represented that he will be able to present evidence establishing that this particular definition is unusual, while Defendants represented that they will be able to present evidence showing that it is ubiquitous.

indicates that Arizona's intermediate court understands [the reasonable expectations] inquiry might be a fact question for the jury in the absence of evidence that the insurance company had reason to believe the policyholder would not have agreed to the exclusion. Perhaps this inquiry is a question of law for the court absent evidence as to the parties' expectations or beliefs, but precedent from Arizona courts is not explicit on this point."); *Jacobson v. Am. Family Ins. Co.*, 2020 WL 919173, *2 (D. Ariz. 2020) ("[W]hile the actual terms of the policy are undisputed, a jury should decide whether the policy should be reformed to be consistent with Cathy Jacobson's alleged reasonable expectations.").

III.    <u>Counts Two (Breach Of Implied Covenant) and Eight (Bad Faith)</u>

A.    **The Parties' Arguments**

Defendants argue that "[a]s an initial matter, Plaintiff's claim for 'bad faith' is redundant of, and co-extensive with, his claim for breach of the implied covenant of good faith and fair dealing." (Doc. 10 at 6.) Defendants further argue that "Arizona law is clear that acting in accordance with the express terms of a contract cannot constitute a breach of the implied covenant of good faith and fair dealing." (*Id.*)

In response, Plaintiff argues that "the implied covenant goes beyond the four corners of a contract" and "can be breached even though the company performs its express covenants under the insurance contract." (Doc. 15 at 14, citation omitted.) Plaintiff further argues that "[i]t has consistently been held that an insurer can be held liable for bad faith even when it does not violate any express provision of the insurance contract." (*Id.*) (citation omitted).

In reply, Defendants clarify that they "do not contend that there can be no breach of the implied covenant of good faith and fair dealing or bad faith if the Defendants did not breach an express provision of the Policy"—rather, their position is that "no breach of the implied covenant of good faith and fair dealing or bad faith claim can survive where the conduct allegedly giving rise to the purported claim . . . was expressly allowed by the Policy." (Doc. 16 at 6.) Defendants further argue that "Plaintiff fails to address this argument" and "Plaintiff can allege no such facts as against Defendants, whose conduct

was expressly permitted by the plain language of the Policy." (*Id.* at 6-7.)

    B.   **Analysis**

The parties disagree over whether Plaintiff's claims in Count Two (breach of the implied covenant of good faith and fair dealing) and Count Eight (bad faith) are co-extensive.

On the one hand, Defendants are correct that the two claims are co-extensive. "A bad faith claim derives from the . . . duty of good faith and fair dealing." *Cavallo v. Phoenix Health Plans, Inc.*, 518 P.3d 759, 764 (Ariz. 2022) (cleaned up). *See also Equity Income Partners LP v. Chicago Title Ins. Co.*, 2014 WL 12745025, *2 (D. Ariz. 2014) ("Plaintiffs brought three claims for relief: breach of contract; breach of the duty of good faith and fair dealing; and insurance bad faith. In Arizona, Plaintiffs' second and third claims are one and the same.") (citation omitted); *Biltmore Assocs., L.L.C. v. Twin City Fire Ins. Co.*, 2006 WL 2091667, *1 n.2 (D. Ariz. 2006) ("[T]he breach of the duty of good faith and fair dealing, and for bad faith . . . are two names for the same cause of action."). On the other hand, to the extent Defendants' position is that such redundancy means one of the claims is therefore subject to dismissal under Rule 12(b)(6), Defendants are—at least outside the context of claims for declaratory relief, as discussed in more detail in Part IV *infra*—mistaken. *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762-63 (9th Cir. 2015) ("To the extent the district court concluded that the cause of action was nonsensical because it was duplicative of or superfluous to Astiana's other claims, this is not grounds for dismissal.") (citing Fed. R. Civ. P. 8(d)(2)).

Turning to the merits, the implied covenant of good faith and fair dealing requires that "each of the parties . . . refrain from any action which would impair the benefits which the other had the right to expect from the contract or the contractual relationship." *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986). *See also Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1038 (Ariz. 1985) ("The covenant requires that neither party do anything that will injure the right of the other to receive the benefits of their agreement."). In the insurance context, "[t]he tort of bad faith arises when the insurance

company intentionally denies, fails to process or pay a claim without a reasonable basis for such action." *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981).

The parties agree that the implied covenant can be breached even when a company performs its express covenants under an insurance contract. *Rawlings*, 726 P.2d at 573. Defendants, however, assert that Counts Two and Eight must be dismissed because the conduct at issue was expressly allowed by the Policy.

True, "[t]he general rule is that an implied covenant of good faith and fair dealing cannot directly contradict an express contract term." *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 (Ariz. Ct. App. 2002). *See also Lee v. PHH Mortg.*, 2024 WL 4364139, *6 (D. Ariz. 2024) ("There is no breach of the implied covenant when a party abides by a contract's express terms."). However, this general rule does not assist Defendants here because, as discussed in Part II above, Plaintiff has plausibly alleged that Defendants' challenged conduct was impermissible under the Policy in light of the reasonable expectations doctrine. *Cf. Wilson v. PartnerRe Ireland Ins. dac*, 2025 WL 2606173, *7 (D. Ariz. 2025) ("Defendant argues that there can be no bad faith where the Policy provides no coverage, and the Court's grant of summary judgment on the breach of contract claim should result in summary judgment here as well. This argument fails because the Court has denied Defendant's request for summary judgment on the contract claim."). Nor does *Frink v. River Source Life Ins. Co.*, 2022 WL 1188087 (D. Ariz. 2022), which Defendants cited during oral argument, compel a different conclusion—there, the plaintiff voluntarily withdrew her claim for bad faith. *Id.* at *1.

Because Defendants only sought dismissal of Counts Two and Eight on two narrow grounds—first, redundancy, and second, because the challenged conduct was permissible under the Policy—and neither argument has merit, Counts Two and Eight are not subject to dismissal at this early stage of the case.

IV.   Count Three (Declaratory Judgment)

A.   **The Parties' Arguments**

Defendants argue that "Plaintiff's declaratory relief claim duplicatively seeks a

declaration about the very issues that an adjudication of Plaintiff's breach of contract claim would resolve" and thus "should be dismissed" because it would not "serve a useful purpose." (Doc. 10 at 7-8.)

In response, Plaintiff argues that Defendants are "mistaken that Plaintiff's claim for declaratory relief is 'duplicative.'" (Doc. 15 at 14, record citation omitted). Plaintiff further argues that his "breach of contract claim seeks money damages, but his declaratory relief claim seeks a proper policy interpretation and seeks prospective class-wide relief in the form of a prohibition on Defendants' offending practices." (*Id.* at 14-15.)

In reply, Defendants argue that "Plaintiff's declaratory judgment claim does not, in fact, seek any 'prohibition' or injunctive relief" but instead "seeks only 'a declaration to pay benefits,' which is the precise relief sought through his breach of contract claim." (Doc. 16 at 7, record citation omitted).

B.    **Analysis**

Plaintiff's requested relief in his claim for declaratory relief is "a declaration that Defendants has [sic] an obligation to pay disability income benefits until each insured reaches the age specified (e.g., age 65 or age 67), not an earlier policy anniversary date at which time the insured has not yet reached the specified age." (Doc. 1 ¶ 75.)

In *Paul Johnson Drywall Inc. v. Sterling Group LP*, 2025 WL 553001 (D. Ariz. 2025), this Court addressed a similar situation. There, as here, a plaintiff asserted both a breach-of-contract claim and a separate claim for declaratory relief that merely sought a declaration adopting the plaintiff's proposed (and disputed) interpretation of the contract at issue. *Id.* at *44. The Court concluded that the claim for declaratory relief in *Paul Johnson Drywall* was subject to dismissal for an array of reasons, two of which are applicable here. First, the claim was "not a proper cause of action, at least where, as here, it simply seeks a declaration concerning some of the merits issues being raised in other causes of action." *Id. See also Staren v. Clarivate Analytics (US), LLC*, 2025 WL 40767, *5 (D. Ariz. 2025) ("[T]he validity of [certain contractual provisions] is intertwined with the merits of Plaintiff's [contract-based claims] in Counts One and Two of the complaint.

Those considerations counsel against issuing independent declaratory relief as to the narrow issues raised in Count Three."); *Schultz v. BAC Home Loans Servicing, LP*, 2011 WL 3684481, *4 (D. Ariz. 2011) ("To the extent that the Plaintiff's complaint seeks to raise an independent cause of action for declaratory relief [to resolve the construction or validity of a written contract], that claim also fails.  Declaratory relief is a remedy for underlying causes of action . . . not a separate cause of action.").  "Second, and more broadly, a federal court need not entertain a request for declaratory relief where, as here, the requested declaration would not resolve the entire case or controversy as to any plaintiff but would merely determine a collateral legal issue governing certain aspects of their pending or future suits."  *Paul Johnson Drywall*, 2025 WL 553001 at *44 (cleaned up).  *See also Madrid v. Concho Elementary Sch. Dist. No. 6 of Apache Cnty.*, 439 F. App'x 566, 567 (9th Cir. 2011) ("[T]he Declaratory Judgment Act authorizes, but does not mandate, relief. . . .  [B]ecause Madrid's claim under the Declaratory Judgment Act requested only contract-related relief, the district court was within its discretion to read that claim as part of Madrid's breach of contract claim and to deny injunctive and declaratory relief.").  Accordingly, Count Three is dismissed.

V.    Count Four (Reformation)

A.    **The Parties' Arguments**

Defendants argue that "none of the limited circumstances permitting reformation of a contract exists in this case."  (Doc. 10 at 12.)  Specifically, Defendants contend that "Plaintiff has not established and cannot establish either a mutual mistake or a unilateral mistake accompanied by fraud or inequitable conduct."  (*Id.*)  As for mutual mistake, Defendants argue that "there was no *mutual* mistake, as evidenced by the Policy's clear and unambiguous terms." (*Id.*)  As for unilateral mistake, Defendants argue that "[a]t most . . . Plaintiff made a *unilateral* mistake," but such a mistake "must be accompanied by fraud or inequitable conduct" and "Plaintiff cannot establish either ground."  (*Id.*)

In response, Plaintiff argues that "[b]oth instances [of mutual and unilateral mistake] are alleged here."  (Doc. 15 at 15.)  Plaintiff argues that "Defendants' own materials . . .

1    raise[] a genuine issue of material fact as to mutual mistake" and that "[t]he Complaint also

2    details the plausible basis for Plaintiff's unilateral mistake and Defendants' fraud and

3    inequitable conduct." (*Id.*)  Plaintiff further argues that "the circumstances of a mutual or

4    unilateral mistake is fact-intensive and not suitable for disposition on the pleadings." (*Id.*)

5        In reply, Defendants argue that Plaintiff cannot establish mutual mistake because

6    "[t]he Policy provided the precise benefits that Defendants intended." (Doc. 16 at 10.)

7    Defendants further argue that Plaintiff cannot establish unilateral mistake because

8    "Plaintiff has not adequately alleged the facts that must accompany a purported unilateral

9    mistake in order to justify reformation." (*Id.* at 11.)

10       B.    **Analysis**

11       Reformation "is the remedy[9] designed to correct a written instrument which fails to

12   express the terms agreed upon by the parties; it is not intended to enforce the terms of an

13   agreement the parties never made." *Isaak v. Mass. Indem. Life Ins. Co.*, 623 P.2d 11, 14

14   (Ariz. 1981).  To seek reformation on the basis of mutual mistake, "the mistake must be

15   established by clear, convincing and satisfactory evidence that a definite intention on which

16   the minds of the parties had met preexisted the written instrument and that the mistake

17   occurred in its execution." *City of Scottsdale v. Burke*, 504 P.2d 552, 555 (Ariz. Ct. App.

18   1972) (cleaned up).  "In the absence of mutual mistake, to reform an instrument because

19   of the unilateral mistake of one party, there must be fraud or inequitable conduct by the

20   other party. . . .  Inequitable conduct which would justify reformation when there is

21   unilateral mistake takes the form of knowledge on the part of one party of the other's

22   mistake." *Isaak*, 623 P.2d at 14.

23       …

---

24
25   [9]    During oral argument, Defendants asserted that because reformation is a remedy

26   rather than a standalone cause of action, Count Four should be dismissed on that basis.
     This marks yet another argument that is forfeited because it was raised for the first time at
     oral argument.  In their motion to dismiss, Defendants only sought the dismissal of Count

27   Four on the ground that "none of the limited circumstances permitting reformation of a
     contract exists in this case," *i.e.*, because the factual allegations in the complaint are
28   insufficient to "establish either a mutual mistake or a unilateral mistake accompanied by
     fraud or inequitable conduct." (Doc. 10 at 12.)  The analysis here is limited to that
     argument.

### 1.   Mutual Mistake

To grant reformation based on mutual mistake, a court "must be presented with clear and convincing evidence that (1) a mutual mistake was made by the parties in drafting the instrument, and (2) that the minds of the parties had met on a definite intention before the instrument was drafted." *Phil Bramsen Distrib., Inc. v. Mastroni*, 726 P.2d 610, 614 (Ariz. Ct. App. 1986) (citation omitted).  A mutual mistake exists, for example, when the parties "clearly intended" for a contract to contain a particular provision but, due to "the error of the scrivener," the agreed-to provision was not included in the contract.  *Id.*  Similarly, "if a seller intends to sell and a buyer intends to buy land other than that described in a deed, a case of mutual mistake is presented."  *Hill-Shafer P'ship v. Chilson Family Trust*, 799 P.2d 810, 814 (Ariz. 1990) (emphasis omitted).  Put simply, "[a] mutual mistake exists where there has been a meeting of the minds of the parties, and an agreement is actually entered into, but the agreement in its written form does not express what was really intended by the parties."  *Id.* (emphasis omitted).

Whatever this case may be, it is not a mutual mistake case.  Everything in the complaint suggests that Defendants intended for the term "Age" to have the meaning ascribed to it in the "Definitions" section of the Policy.  There is no allegation, for example, that the parties engaged in negotiations during which they both agreed that the term "Age" would mean the insured's birthday, only for a scrivener to make an error during the drafting process that somehow resulted in a different definition of the term "Age" being inserted into the Policy.

Notwithstanding this, Plaintiff cites *Ashton*, which observes that "[p]roof of mutual mistake involves, to a great extent, evidence of subjective facts."  *State v. Ashton Co.*, 422 P.2d 727, 730 (Ariz. Ct. App. 1967).  The subjective nature of the mutual mistake doctrine, however, cannot make up for a complaint lacking the sort of factual allegations necessary to plausibly establish the elements of a mutual mistake claim.  Although the allegations in the complaint may plausibly suggest that Plaintiff and Defendants "had different understandings of the same material provision of the agreement," this sort of "alleged

1    mutual misunderstanding is not a mutual mistake." *Hartford v. Industrial Comm'n of Ariz.*,

2    870 P.2d 1202, 1207 (Ariz. Ct. App. 1994).

3                  2.    Unilateral Mistake

4          A unilateral mistake is "one where only one party to an agreement is mistaken as to

5    the subject matter or the agreement's expression." *Connelly v. Connelly*, 2016 WL

6    7156437, *3 (Ariz. Ct. App. 2016).  To grant reformation based on a unilateral mistake,

7    "there must be fraud or inequitable conduct by the other party." *Isaak*, 623 P.2d at 14.

8          As discussed in Part II above, the complaint plausibly alleges that Defendants had

9    "reason to know" Plaintiff would not agree to the Policy if he was aware of how the Policy

10   defined the term "Age."  The complaint also plausibly alleges—albeit without using the

11   magic word "mistake," the absence of which Defendants emphasized during oral

12   argument—that Plaintiff was, in fact, operating under a misunderstanding of this feature of

13   the Policy.  (Doc. 1 ¶ 92 ["Plaintiff . . . would not have entered [the Policy] . . . had [he]

14   known the truth."].)

15         Meanwhile, one way of showing inequitable conduct, for purposes of raising a claim

16   of unilateral mistake, is by showing that "the other party knew of and unfairly took

17   advantage of the other party's error." *Hartford*, 870 P.2d at 1207.  Therefore, if having

18   "reason to know" of Plaintiff's mistake is the same thing as knowing of, and unfairly taking

19   advantage of, that mistake, Plaintiff has also plausibly alleged a claim of unilateral mistake.

20         Unfortunately, the parties' motion papers do not address whether having "reason to

21   know" of an insured's mistake is tantamount to knowing of, and unfairly taking advantage

22   of, that mistake.  Nor was the Court able to find, through its own research, any Arizona

23   authorities addressing that precise question.  Even so, many courts have concluded, albeit

24   in different contexts, that having "reason to know" of a particular fact is functionally

25   equivalent to having actual knowledge of that fact. *Freeman United Coal Min. Co. v. Fed.*

26   *Mine Safety & Health Review Comm'n*, 108 F.3d 358, 363 (D.C. Cir. 1997) (upholding

27   agency's determination that the term "knowingly" means "knowing or having reason to

28   know," noting that many courts have "found that 'knowingly' encompasses more than

actual knowledge," and concluding that the agency's definition of "knowledge" to "include both actual and constructive knowledge of a violative condition . . . falls well within the range of interpretations given to the term 'knowingly' in other contexts").  *But see Broadway Nat. Bank v. G & L Athletic Supplies, Inc.*, 691 P.2d 400, 405 (Kan. Ct. App. 1984) ("[A]ctual knowledge does not encompass 'reason to know' within its meaning.").

At any rate, it was Defendants' burden to establish why Count Four is subject to dismissal under Rule 12(b)(6).  *See, e.g.*, *Cohen v. Bd. of Trs. of Univ. of D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) (citing treatise for the proposition that "[a]ll federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists"); *Bangura v. Hansen*, 434 F.3d 487, 498 (6th Cir. 2006) ("[O]n a 12(b)(6) motion, the moving party bears the burden of demonstrating that the plaintiff failed to state a claim."); *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) ("In a Rule 12(b)(6) motion, the . . . defendant bears the burden of showing that no claim has been presented.") (cleaned up).  On this record, Defendants have not met that burden, at least with respect to Plaintiff's unilateral mistake theory.

VI.    <u>Fraud-Based Claims: Counts Five (Fraudulent Inducement), Six (Negligent Misrepresentation), and Seven (Violation Of Consumer Protection Laws)</u>

    A.    **Count Five (Fraudulent Inducement)**

        1.    <u>The Parties' Arguments</u>

Defendants argue that Plaintiff's fraudulent inducement claim should be dismissed for two reasons: (1) the claim is not pleaded "with the specificity required by Rule 9(b)"; and (2) Plaintiff is not "able to satisfy the reliance element" of the claim.  (Doc. 10 at 8.) As for the Rule 9(b) argument, Defendants argue that "Plaintiff improperly lumps all 'Defendants' together" and thus "Plaintiff has failed to plead sufficient information for Defendants to ascertain whom among them is being alleged to have misrepresented the Policy's terms, what the substantive purported misrepresentation was, and when, where, and how it was made to Plaintiff."  (*Id.* at 9.)  As for the reliance argument, Defendants argue that "the Policy contains a '10 day free examination period,'" which is "designed to

provide a remedy for any alleged misunderstandings," so "Plaintiff could not have relied upon the alleged misrepresentations and omissions made in connection with the application." (*Id.* at 10-12.)

In response, Plaintiff disputes both points. (Doc. 15 at 7.) As for Rule 9(b), Plaintiff argues that the allegations in the complaint are "more than sufficient to put Defendants on notice of the who, what, where, why, and how, and therefore easily satisfy Rule 9(b)." (*Id.* at 9.) As for the reliance argument, Plaintiff argues that "aside from being a fact question, whether a reasonable consumer might not have relied on Defendants' misrepresentations and omissions in light of the period-of-review clause is simply immaterial, and certainly not dispositive as a matter of law." (*Id.* at 8-9.)

In reply, Defendants reiterate their argument that Plaintiff's allegations "impermissibly lump[] Defendants together in violation of Rule 9(b)" and "are insufficient to allege any of Plaintiff's fraud-based claims." (Doc. 16 at 8-9.) Defendants further argue that Plaintiff's ability to review the policy for 10 days before accepting it means "he cannot plausibly allege that he relied upon any alleged misrepresentations." (*Id.* at 10.)

## 2. Analysis

Under Arizona law, a fraudulent inducement claim requires "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; [and] (9) the hearer's consequent and proximate injury." *Duncan v. Pub. Storage, Inc.*, 507 P.3d 509, 514-15 (Ariz. Ct. App. 2022).

Rule 9(b) requires that the circumstances constituting fraud be stated with particularity. *See also Van Go LLC v. Potts*, 2016 WL 4974968, *3 (D. Ariz. 2016) ("Where a plaintiff alleges fraud or misrepresentation, Rule 9(b) imposes heightened pleading requirements. While malice, intent, knowledge, and other conditions of mind may be alleged generally, the circumstances constituting fraud must be pled with

particularity."). A plaintiff must "set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106 (cleaned up). In addition, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (citation and internal quotation marks omitted).

Plaintiff has failed to satisfy the pleading requirements of Rule 9(b) with respect to his fraudulent inducement claim. Although Plaintiff asserts that the complaint provides the requisite who, what, when, where, and how of the fraud, that is simply not the case.

With respect to the "who," the complaint repeatably lumps Defendants together, failing to inform each Defendant of the allegations surrounding its specific alleged participation. The complaint alleges "Defendants affirmatively misrepresented facts about *their* disability insurance benefits and terms of policies" (Doc. 1 ¶ 89, emphasis added), "Defendants omitted material facts" (*id.* ¶ 90), "Defendants' conduct induced" (*id.* ¶ 92), and "Defendants actively concealed *their* misrepresentations" (*id.* ¶ 97, emphasis added). At no point does Plaintiff adequately differentiate his allegations against each Defendant or identify which Defendant made each challenged representation. Plaintiff's response brief asserts that the "who" arises from the fact that "New York Life markets disability insurance, which Paul Revere administers, at the direction of Unum." (Doc. 15 at 9, record citations omitted.) However, the *complaint* fails to "identify the role of each defendant in the alleged fraudulent scheme." *Swartz*, 476 F.3d at 765 (cleaned up).

Nor are the problems limited to the "who" question. The complaint alleges that "Defendants affirmatively misrepresented material facts about their disability insurance benefits and terms of policies with Plaintiff and other putative Class members, including but not limited to whether payments would be made until each insured reached a certain age (e.g., age 65 or age 67), not some other earlier date." (Doc. 1 ¶ 89.) The complaint further alleges that "Defendants made these misrepresentations, or omitted material

information, in its promotional materials and representations, and policy-related materials." (*Id.* ¶ 91.) The complaint goes on to allege that "Defendants' conduct induced customers to pay premiums for benefits that Defendants had no intention of paying." (*Id.* ¶ 92.) These allegations fail to specify "what," exactly, in the promotional materials was misrepresented or the specific content of each alleged misrepresentation. These allegations also fail to adequately specify "when" and "where" the misrepresentations appeared—Defendants presumably issued many different "promotional materials" between the four of them, but the complaint does not identify which particular promotional materials contained the challenged misrepresentations.

This conclusion is not altered by the fact that Plaintiff also appears to be accusing Defendants of misleading him through omissions. The fraudulent inducement claim includes an allegation that "Defendants omitted material facts including, inter alia, that the disability income benefit payments available under the policies would not run through insureds' birth dates, as represented in the promotional materials and policy-related materials, but would run through some earlier date only." (*Id.* ¶ 90.) Elsewhere, the complaint alleges that "[e]ach Defendant . . . omitted material information in its communications with or disclosures to Plaintiff." (*Id.* ¶ 118.) Even under Rule 9(b)'s relaxed standard for fraud-by-omission claims, the complaint remains deficient. Plaintiff again lumps Defendants together for purposes of his omission allegations. Nor does the complaint specify which promotional materials and policy-related materials contained the omissions or what passages in those unspecified materials contained the omissions.[10]

B.    **Count Six (Negligent Misrepresentation)**

1.    The Parties' Arguments

The parties' arguments regarding Plaintiff's negligent misrepresentation claim are identical to their arguments regarding Plaintiff's fraudulent inducement claim.

---

[10]    Given this determination, it is unnecessary to address Defendants' alternative dismissal arguments related to reliance. With that said, reasonableness of reliance "generally is a question of fact for the jury." *Pluto Props., LLC v. Hendricks & Partners, Inc.*, 2009 WL 3644803, *3 (Ariz. Ct. App. 2009).

2.    <u>Analysis</u>

Arizona recognizes the tort of negligent misrepresentation as defined in the Restatement (Second) of Torts § 552(1) (1977), which provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Haisch v. Allstate Ins. Co.*, 5 P.3d 940, 944 (Ariz. Ct. App. 2000). "The elements of negligent misrepresentation are: (1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the incorrect information; and (5) resulting damage." *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 340 P.3d 405, 412 n.7 (Ariz. Ct. App. 2014).

Plaintiff's negligent misrepresentation claim is deficient under Rule 9(b) for the same reasons as Plaintiff's fraudulent inducement claim. This outcome, again, makes it unnecessary to reach Defendants' alternative arguments regarding reliance.

C.    **Count Seven (Violation Of Consumer Protection Laws)**

1.    <u>The Parties' Arguments</u>

The parties' arguments regarding Plaintiff's ACFA claim are identical to their arguments regarding Plaintiff's fraudulent inducement and negligent misrepresentation claims.

2.    <u>Analysis</u>

Under the ACFA, it is unlawful for any person to use or employ "any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." A.R.S. § 44-1522(A). The elements of an ACFA claim are "(1) a

1  false promise or misrepresentation made in connection with the sale or advertisement of

2  'merchandise,' and (2) consequent and proximate injury resulting from the

3  misrepresentation." *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 953 (Ariz. 2016).[11]

4      As with his other fraud-based claims, Plaintiff fails to plead his ACFA claim with

5  the level of particularity required by Rule 9(b).

6  VII.  <u>Leave To Amend</u>

7      In their motion to dismiss, Defendants argue that "Plaintiff's Complaint should be

8  dismissed in its entirety, with prejudice" because "granting leave to amend would be

9  futile."  (Doc. 10 at 14.)  In response, Plaintiff "respectfully requests an opportunity to

10  amend the Complaint, which he has not yet done."  (Doc. 15 at 15.)

11      "Rule 15 advises the court that 'leave [to amend] shall be freely given when justice

12  so requires.'"  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

13  "This policy is 'to be applied with extreme liberality.'"  *Id.* (citation omitted).  Thus, the

14  Court shouldn't deny leave to amend unless "the amendment: (1) prejudices the opposing

15  party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."

16  *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

17      It does not appear to the Court that amendment would be futile (which is

18  Defendants' only proffered basis for opposing the amendment request).  Thus, Plaintiff's

19  amendment request is granted.

20      …

21      …

22      …

23      …

24      …

25      …

26

---

27  [11]    It should be noted that the complaint cites 54 different consumer protection laws
from various states and territories.  (Doc. 1 ¶ 114.)  However, Plaintiff acknowledges that,
28  as "an Arizona resident, [Plaintiff] is only asserting his own claims under Arizona law."
(Doc. 15 at 8 n.1.)

1    Accordingly,

2    **IT IS ORDERED** that:

3    1.    Defendants' motion to dismiss (Doc. 10) is **granted in part and denied in
4    part**.  Counts Three, Five, Six, and Seven of the complaint are dismissed.

5    2.    Plaintiff may file a First Amended Complaint ("FAC") within 14 days of the
6    issuance of this order.  Any changes shall be limited to attempting to rectify the deficiencies
7    identified in this order.  Plaintiff shall, consistent with LRCiv 15.1, attach a redlined
8    version of the pleading as an exhibit.

9    Dated this 30th day of October, 2025.

10

11

12    _____
13    Dominic W. Lanza
      United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28